# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Martin C. Ashman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 2297 | **DATE** | 9/7/2004 |
| **CASE TITLE** | Catherine McLachlan vs. Jo Anne B. Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter memorandum opinion and order. The Commissioner's motion for summary judgment [28-1] is granted and plaintiff's motion for summary judgment [20-1] is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | SEP 08 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | 33 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 9/7/2004 | |
| | | | date mailed notice | |
| IS | courtroom deputy's initials | | IS | |
| | | | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CATHERINE MCLACHLAN,                )
                                    )
              Plaintiff,            )       Case No. 03 C 2297
                                    )
       v.                           )       Magistrate Judge
                                    )         Martin C. Ashman
JO ANNE B. BARNHART, Commissioner   )
of the Social Security Administration, )
                                    )
              Defendant.            )

## MEMORANDUM OPINION AND ORDER

Plaintiff Catherine McLachlan seeks judicial review, pursuant to 42 U.S.C. § 405(g), of

the final decision of the Commissioner of the Social Security Administration that she was not

entitled to Supplemental Security Income ("SSI").[1]  The parties have consented to have this Court

conduct any and all proceedings in this case, including the entry of final judgment.  *See* 28

U.S.C. § 636(c); Local R. 73.1(a).  Presently before this Court are both Plaintiff's and

Defendant's motions for summary judgment.  For the reasons set forth below, this Court grants

Defendant's motion and denies Plaintiff's motion.

---

[1] Supplemental Security Income provides financial assistance to needy individuals 65 years of age or older, are blind, or are 18 years of age and permanently and totally disabled.  42 U.S.C. §§ 1381, 1382.

# I.  Procedural History

On August 18, 1998, Plaintiff applied for SSI benefits alleging disability due to arm, leg and neck pain since November 13, 1995.[2] (R. at 34, 60.) After the application was denied both initially and on reconsideration, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (R. at 34, 39, 43.) On November 17, 1999, the ALJ conducted the administrative hearing and heard testimony from Plaintiff, who was represented by counsel, and a vocational expert. (R. at 652-701.) On March 22, 2000, the ALJ rendered an unfavorable decision finding Plaintiff not disabled. (R. at 19-26.) This decision became the final decision of the Commissioner on June 27, 2002, when the Appeals Council denied Plaintiff's request for review. (R. at 8-9.) *See* 20 C.F.R. § 422.210(a). Plaintiff now seeks judicial review of that decision.

# II.  Background Facts

## A.  Plaintiff's Background

Plaintiff was born on March 17, 1951, and was forty-nine years old at the time of the ALJ's decision. (R. at 19, 26.) She has thirteen years of education and past work experience as a home health care attendant and as a hairdresser. (R. at 19.) Plaintiff was employed as a hairdresser when she slipped and fell on November 11, 1995. (R. at 112, 118.)

---

[2] Plaintiff fell at work on November 11, 1995, (R. at 118), but asserted her disability occurred on November 13, 1995 in her Supplemental Security Income application filed August 18, 1998. (R. at 60.)

## B.     Medical History

Plaintiff was taken to the emergency room on November 11, 1995 after her fall and was seen by Dr. Afzal Hussain. Dr. Hussain diagnosed Plaintiff with hemarthrosis[3] in the left elbow. (R. at 112.) The x-rays did not reveal any definitive evidence of a fracture, though there was tenderness and swelling around the elbow which suggested a fracture may have been present. (R. at 114.)

Plaintiff's fall marked the beginning of a series of health problems and hospital visits. On November 16, 1995, Plaintiff went to Mercy Center Occupational Health Services complaining of left elbow pain. (R. at 118.) Although the x-ray report did not provide evidence of a fracture, Plaintiff was diagnosed with a radial head fracture in the left arm and referred to an orthopedist. (Id.) She denied any numbness or pareshesia to her left hand. (Id.)

On February 1, 1997, Plaintiff went to the emergency room at Alexian Brothers Medical Center complaining of severe left arm pain. (R. at 120.) An examination of Plaintiff's cervical spine revealed mild degenerative changes and no evidence of a fracture. (R. at 124.) Electromyographic results indicated a mild dysfunction of the ulnar nerve across the elbow. (R. at 135.)

On September 16, 1998, Plaintiff went to the emergency room at Rush-Copley Medical Center complaining of pain in her neck, arm and back. (R. at 136.) She also complained of right lumbar hip pain that radiated down her right leg. (Id.) Plaintiff indicated that she needed disability papers filled out. (Id.) Plaintiff's left arm was put in a sling and she was told to

---

[3] Hemarthrosis is blood in the joint. STEDMAN'S MEDICAL DICTIONARY 795 (Maureen Barlow Pugh et al. eds., 27th ed. 2000), hereinafter "STEDMAN'S."

follow-up with Dr. Goldfarb for the pain in her left arm and with neurosurgeon Dr. Gryfinski for her lower back pain. (R. at 138.)

Plaintiff was examined by Dr. Richard Grayson on November 12, 1998. (R. at 145.) Plaintiff reported pain in the left elbow and upper arm, pain in the left side of her neck, pain in the right buttock running down the right leg, occasional swelling in the left wrist, a clicking sound in the left forearm, and occasional numbness in the right hand. (Id.) The examination indicated that Plaintiff had a full range of motion in the knees and spine. (R. at 146.) It also revealed that Plaintiff's grip in the left hand was very weak, (one out of ten), while the grip in the right hand was normal, (ten out of ten). (Id.) Plaintiff was able to rotate and flex both elbows normally and she had a normal range of motion of both shoulders. (Id.) The diagnostic impression was possible cervical radiculopathy on the left and possible cervical disc syndrome on the left. (Id.)

On December 1, 1998, a state agent determined Plaintiff's RFC and found that Plaintiff could perform light work with limited pushing and pulling in her left upper extremity. (R. at 101-08.) Then on December 9, 1998, Dr. R. T. Patey, a state agency medical consultant, reviewed the medical evidence and the RFC assessment and concurred with the findings. (R. at 108.) The RFC assessment determined that Plaintiff should never climb ladders, ropes or scaffolds due to the weakness in her left arm and should avoid working around heavy machinery and unprotected heights. (R. at 103, 105.) On April 1, 1999, Dr. James Graham also reviewed the medical evidence and the RFC assessment and agreed with the conclusions. (R. at 108.)

On January 15, 1999, Plaintiff went to the Hygienic Institute Community Health Center

complaining of a sore right shin. (R. at 150.) The treatment notes indicated that Plaintiff had been scraping off scabs on her legs with a knife and that she believed the center of the wound had "stinger type" object which she claimed to have removed. (Id.) Plaintiff's right shin was red and ulcerated. (Id.) On January 22, 1999, Plaintiff returned to the Hygienic Institute for a follow-up visit and was instructed to stop scraping her leg, which was not infected. (R. at 151.) She complained of left arm pain, but was found to have a full range of motion in her left arm and her elbow extended and flexed fully. (R. at 152.)

Plaintiff went to the emergency room at the Community Hospital of Ottawa on March 19, 1999 because she wanted another opinion on her leg. She stated that she scratched the scabs off the lesions on her legs because it makes it feel better. (R. at 162.) There is no swelling to the calf, no petechiae, and no pedal edema. (Id.) An x-ray of the tibia and fibula did not reveal any abnormalities. (R. at 165.)

### C.    Plaintiff's Testimony

At the hearing before the ALJ, Plaintiff testified to having pain in her neck, shoulders, back, left arm and right leg. (R. at 663.) She stated she was suppose to take Celebrex, but did not have the money to pay for it so she took Extra Strength Tylenol and Tylenol PM for the pain, which helped. (R. at 661-62.) Plaintiff also claimed that the pain in her shoulder and arm occurred ninety-five percent of the time. (R. at 664.) She rated her pain as an eight on a zero to ten scale and stated that the pain limited her ability to stand, sit and walk. (R. at 666, 670-73.) She testified to being able to walk "a lot," but believed her walking ability had been adversely affected by the ninety brown recluse spider bites she had received in the past. (R. at 664, 670-

71.)  Plaintiff stated she was able to drive, visit friends, perform general housework, and buy groceries.  (R. at 676-78, 680, 683.)

### D.  Vocational Expert's Testimony

Jennie Chin, a vocational expert ("VE") also testified at the hearing in front of the ALJ. (R. at 650.)  The ALJ posed a hypothetical question, directing the VE to assume an individual with Plaintiff's vocational characteristics, including thirteen years of education, who is limited to a full range of light work, except very limited use of the left upper extremity, and reduced interaction with others due to pain.  (R. at 655, 686.)  The VE found that this hypothetical person could perform jobs such as cleaner, assembler, and security guard which came to a combined total of more than 32,000 such jobs in the State of Illinois.  (R. at 24.)  The VE also stated that if the hypothetical individual were reduced to sedentary work, that individual could perform similar jobs at the sedentary level.  (R. at 690-91.)

Plaintiff's attorney also asked the VE to consider the additional limitation of only being able to walk for approximately three hours a day.  The VE stated that if the hypothetical person could only walk and stand for three hours a day, this person would not be able to perform light work because the requirement for light work is being able to walk and stand for six hours out of an eight hour work day.  (R. at 688-89.)

### E.  Post-Hearing Medical Evidence

On March 30, 2000, Dr. Ramsis Ghaly began treating Plaintiff.  (R. at 220.)  An MRI report of the elbow did not reveal any signs of a fracture.  (R. at 221.)  Dr. Ghaly believed

Plaintiff suffered from pain caused by ulnar neuropathy distribution. (Id.) Dr. Ghaly noticed scarring on Plaintiff's legs and was told by Plaintiff that the scarring was due to spider bites. (Id.) In addition to the medical treatment he wanted to provide, Dr. Ghaly thought Plaintiff should see a psychologist. (R. at 222.)

Dr. Ghaly referred Plaintiff to Dr. W. Farrell on May 19, 2000. Plaintiff continued to complain of pain in the right lower limb and left upper extremity. (R. at 406.) Upon examination, the range of motion in Plaintiff's arm was normal, and Dr. Farrell agreed that the MRI report of her left elbow was unremarkable. (Id.) Dr. Farrell recommended chronic pain management. (R. at 406.) On May 30, 2000, Dr. Ghaly agreed with Dr. Farrell's diagnosis that Plaintiff should go to chronic pain management, and indicated that "surgical intervention is not clearly necessary. (R. at 408.)

Pursuant to Dr. Ghaly's referral, Plaintiff went to see Dr. Brian Couri on June 15, 2000 for a physiatric[4] consultation. (R. at 254.) Dr. Couri found that Plaintiff suffered from myofascial[5] pain in the left arm and shoulder. (Id.) However, because he found a good range of motion and movement with her left arm and complete use of her right arm, Dr. Couri did not believe Plaintiff was disabled. (Id.) However, he recommended that Plaintiff see a pain psychologist. (Id. at 255.) Dr. Couri also wanted Plaintiff to undergo a Functional Capacity Evaluation ("FCE") to help him assess her physical condition and the options available to her. (Id.) Plaintiff underwent a FCE on June 20-21, 2000. (R. at 359.) The FCE Summary Report

---

[4] Physiatric means rehabilitation. STEDMAN'S at 1380.

[5] Myofascial means of or relating to the fibrous tissue surrounding and separating muscle tissue. STEDMAN'S at 647 and 1173.

indicated a diagnosis of left upper extremity myofascial pain. (Id.) The report also indicated that Plaintiff had difficulty lifting items repeatedly because of the pain she experienced. (R. at 362.)

On July 14, 2000, Plaintiff went to Ottawa Medical Center with ulcers on her legs. (R. at 348.) She claimed she was bitten by brown recluse spiders. (Id.) A notation indicates that Plaintiff had been referred by her prior doctors to a psychologist for chronic pain management. (Id.)

On September 1, 2000, Plaintiff saw Dr. Dirk Steinert at the Ottawa Medical Center because of the sores on her legs and to obtain more medical evidence of her disability. (R. at 350.) Dr. Steinert noted that Plaintiff had not gone to see a psychiatrist or a pain specialist as previously instructed and he told her to do so. (Id.) Dr. Steinert prescribed 100 mg of Neurontin[6] three times a day. (Id.) From March 2001 through May 2002, Plaintiff repeatedly returned to the emergency room or sought medical treatment for back, neck and arm pain. (E.g., R. at 177-87, 193, 197, 624.) On October 9, 2001, she was diagnosed with chronic back and musculoskeletal pain. (R. at 182.)

### III.   ALJ'S Findings

The ALJ made the following specific findings (as taken verbatim from his March 22, 2000 decision):

1.   The claimant has not engaged in substantial gainful activity since
     August 18, 1998.

---

[6] Neurotin (gabapentin) prevents allodynia (pain related behavior in response to a normally innocuous stimulus) and hyperalgesia (exaggerated response to painful stimuli). *Physicians' Desk Reference* 2559 (58th ed. 2004).

2.	The medical evidence establishes that the claimant has a severe disorder of the muscle, ligament, and facia, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

3.	The claimant's allegation of a total disabling condition is found to be not credible.

4.	The claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work except for lifting more than 20 pounds maximum occasionally and 10 pounds frequently. The claimant has limited use of her left upper extremity (non-dominant), and grip strength of only one out of ten in her left hand. She also has restrictions on interacting with others due to pain (20 C.F.R. 416.945).

5.	The claimant is unable to perform her past relevant work as a home health care worker.

6.	The claimant's residual functional capacity for the full range of light work is reduced by the above-listed limitations.

7.	The claimant is 48 years old, which is defined as a younger individual (20 C.F.R. 416.963).

8.	The claimant has a high school education (20 C.F.R. 416.964).

9.	The claimant does not have any acquired work skills which are transferable to the skilled or semiskilled work functions of other work (20 C.F.R. 416.968).

10.	Based on an exertional capacity for light work, and the claimant's age, education, and work experience, section 416.969 of Regulations No. 16 and Rule 202.21, Table No. 2, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

11.	The claimant's capacity for the full range of light work has not been significantly compromised by additional nonexertional limitations. Accordingly, using the above-cited rule as a framework for decisionmaking, the claimant is not disabled.

12.     The claimant was not under a "disability," as defined in the Social
        Security Act, at any time through the date of this decision (20
        C.F.R. 416.920(f)).


# IV.     Discussion

Social Security regulations require that a claimant suffer from a disability within the

meaning of the Social Security Act in order to receive Supplemental Security Income.  An

individual is disabled if she is unable to "engage in any substantial gainful activity[7] by reason of

any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12

months . . . ."  42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a).  To meet this

definition, an individual must have a severe impairment[8] which makes her unable to do her

previous work or any other substantial gainful activity which exists in the national economy.  20

C.F.R. § 404.1505(a).  The determination of a disability involves both medical and vocational

issues and requires a five-step process.

In the present case, the ALJ followed the five-step process and found that (1) Plaintiff

was not presently employed; (2) her impairment was "severe," and expected to last at least 12

------

[7] Substantial Gainful Activity means work that: (a) involves doing significant and
productive physical or mental duties; and (b) is done (or intended) for pay or profit.  20 C.F.R.
§ 404.1510.

[8] Disabling Impairment is an impairment (or combination of impairments) which, of
itself, is so severe that it meets or equals a set of criteria in the Listing of Impairments in
appendix 1 of this subpart or which, when considered with your age, education, and work
experience, would result in a finding that you are disabled under § 404.1594.  20 C.F.R.
§ 404.1511(a).

months; (3) her impairment does not meet or exceed one of the listed specific impairments; (4) Plaintiff is unable to perform her past relevant work experience; and (5) Plaintiff is able to perform other work within her residual functional capacity[9] in the national economy. (R. at 24.) *See* 20 C.F.R. § 416.920; *Herron v. Shalala*, 19 F.3d 329, 333 n.8 (7th Cir. 1994). Relying on Plaintiff's residual functional capacity and the vocational expert's testimony, the ALJ concluded at step five that Plaintiff was not disabled because she could perform light work that existed within the national economy. (R. at 24-25.)

Section 205(g) of the Social Security Act grants federal courts the authority to review final decisions of the Commissioner with the power to affirm, modify or reverse, with or without remand to the Commissioner for rehearing. 42 U.S.C. § 405(g). However, the scope of review this Court must use is quite limited; the Commissioner's decision must be affirmed so long as it is supported by substantial evidence. *See Herron*, 19 F.3d at 333.

Substantial evidence is relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Id.* The ALJ's findings must be supported by more than a scintilla of evidence, but may be supported by less than the full weight of the evidence. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992); *Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir. 1986). The reviewing court must consider all evidence on the record; however, it may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ, because the ALJ must resolve all factual issues and evidentiary conflicts. *Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004);

---

[9] Residual Functional Capacity is defined as that which an applicant can still do despite physical and mental limitations imposed by his impairments which affect what he can do in a work setting. 20 C.F.R. § 404.1545(a).

*Delgado*, 782 F.2d at 82. Therefore, the critical question for this Court to answer is not whether Plaintiff was disabled, but whether there was substantial evidence in the record to support the ALJ's findings. *See Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).

Plaintiff contests the ALJ's decision that she was not disabled. First, Plaintiff claims that the ALJ's Residual Functional Capacity ("RFC") assessment was insufficient because it failed to provide a function-by-function analysis of all of the components of light work. Secondly, Plaintiff argues that the ALJ failed to incorporate all of her limitations in the hypothetical question presented to the VE and thus failed to meet his burden of proof at step five. Next, Plaintiff asserts that the ALJ failed to reconcile the VE's testimony with the DOT. Finally, Plaintiff states that the ALJ failed to assess her mental impairment in accordance with the Commissioner's rulings.

### A.     Residual Functional Capacity

Plaintiff claims that the ALJ failed to properly assess Plaintiff's residual functional capacity because he did not provide a function-by-function analysis of all of the components of light work[10] listed in 20 C.F.R. §§ 404.1545(b) and 416.967(b). Specifically, Plaintiff asserts that the ALJ failed to determine exactly how long Plaintiff could stand, sit or walk and how much weight Plaintiff could lift even though Plaintiff complained of problems with standing and walking at the hearing before the ALJ. Plaintiff asserts that the ALJ cannot provide a general

---

[10] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. § 416.967(b).

assessment of Plaintiff's ability to perform all of the components of light work without any explanation.

Residual functional capacity is an administrative determination of what a claimant can do despite her physical limitations and is based on all of the evidence in the record. 20 C.F.R. § 404.1545(a)(1); 20 C.F.R. § 416.945(a)(1); *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The determination of Plaintiff's RFC is reserved for the ALJ and it is a legal decision not a medical one. *See* 20 C.F.R. § 416.946; 20 C.F.R. § 416.927(e); SSR 96-5p; *Dixon*, 270 F.3d at 1178; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). The ALJ must consider both the medical and non-medical evidence in the record when assessing Plaintiff's RFC. *See Dixon*, 270 F.3d at 1178. This Court's review of the ALJ's decision is quite limited. *See Cass v. Shalala*, 8 F.3d 552, 554-55 (7th Cir. 1993). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).

In the instant case, the ALJ ultimately determined that Plaintiff retained the ability to perform light work, although he noted Plaintiff's limited use of her left arm, a left hand grip one-tenth of normal, and restricted interaction with others due to pain. (R. at 23, 25.) In coming to this determination, the ALJ thoroughly reviewed the medical and non-medical evidence. The ALJ relied on the opinions of the state agency physicians because their opinions were supported by the objective medical evidence and were uncontradicted by any other medical evidence in the record. (R. at 23.) The ALJ noted that recent x-rays of Plaintiff's left arm and leg were normal, EMG/NCV nerve studies indicated only mild dysfunction, and although Plaintiff's left grip strength was only one-tenth of normal at her consultative examination, this was a subjective measurement based on how much force Plaintiff was willing to exert. (Id.) The ALJ noted that

- 13 -

Plaintiff was not treated extensively for her condition and she was not being treated by one doctor on a regular basis, but went to the emergency room for most of her complaints. (Id.) Also, during the hearing the ALJ noted Plaintiff's ability to use her left arm to sort through documents and adjust her hair above shoulder level. (Id.) In light of the discrepancies between Plaintiff's complaints of pain and the objective medical evidence, the ALJ found Plaintiff not entirely credible in her allegations of total disabling pain. (Id.)

Plaintiff argues that the ALJ erred when he did not determine how long Plaintiff could stand or sit, how much weight Plaintiff could lift, and when the ALJ allegedly failed to provide any analysis of these factors. (Pl.'s Mem. at 16.) Yet the record indicates that the ALJ relied on the RFC assessment approved by Drs. Patey and Graham, which found that Plaintiff could frequently lift ten pounds and occasionally lift twenty pounds; stand and/or walk for about six hours out of an eight hour workday; and sit for approximately six hours out of an eight hour workday. (R. at 25, 101-08.) By articulating his reliance on the RFC assessment approved by Drs. Patey and Graham before determining Plaintiff could perform light work the ALJ "sufficiently articulate[d] his assessment of the evidence to assure us that [he] considered the important evidence" and he "[built] an accurate and logical bridge between the evidence and the result." *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999).

Plaintiff argues that the ALJ erred in relying on state agency physicians because they were non-examining, non-treating physicians. (Pl.'s Resp. at 3.) Plaintiff relies on *Allen v. Weinberger* to support her proposition that reports regarding disability based on the opinions of non-examining physicians are not a competent basis for evaluation. 552 F.2d 781, 786 (7th Cir. 1977). We decline to accept Plaintiff's reading of *Allen*. First, we note that *Allen* does not hold

- 14 -

that the ALJ should never rely on the opinions of non-examining physicians as this would be contrary to the regulations. *See, e.g.,* 20 C.F.R. § 416.927(d) and §404.1527(d) (stating that all medical evidence, which include the opinions of treating and non-treating physicians, will be evaluated). Next, Plaintiff fails to recognize the most important factor that distinguishes *Allen* from the instant case. The claimant in *Allen* had a treating physician who had performed surgery on him, which allowed the treating physician to directly examine the claimant's spinal disorder. *Id.* at 785. The treating physician also examined the claimant several times after the surgery. *Id.* Upon review, the court in *Allen* stated that the opinions of the non-examining physicians should be weighed properly in light of the superior knowledge the treating physician possessed of the claimant's condition. *Allen*, 552 F.2d at 785-86. In the present case, Plaintiff does not have a treating physician, but goes to the emergency room for most of her complaints. (R. at 23.)

Furthermore, more recent Seventh Circuit opinions indicate that not only are the determinations of non-examining physicians relevant evidence, but there are times when the opinions of non-examining physicians may hold more weight than the treating physician's opinion. *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985) (the regular physician may want to do a favor for a friend and client and may too quickly find disability). Additionally, the treating physician may not know how her patient's medical situation compares to others, and therefore "a consulting physician's opinion might have the advantages of both impartiality and expertise." *Dixon*, 270 F.3d at 1177. Therefore, in the present case, in light of the fact that Plaintiff did not have a regular treating physician and that objective medical evidence supported the determination of the state agency physicians, the ALJ properly relied on the opinions of the

state agency physicians who examined Plaintiff's medical file and determined her residual functional capacity.

Plaintiff asserts that the ALJ committed reversible error when he failed to provide a function-by-function analysis of the functions listed in paragraphs (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. The ALJ is not required to provide a written evaluation of each piece of evidence, yet he may not select and only discuss evidence that favors his ultimate conclusion. *Herron*, 19 F.3d at 333. In this case, the record indicates that the ALJ considered all of the evidence, including the evidence that did not support his ultimate conclusion. At the hearing the ALJ heard Plaintiff's testimony regarding her ability to only stand and walk for two or three hours a day. (R. at 688.) The ALJ also considered Plaintiff's weak grip strength in her left hand and Plaintiff's allegations of total disabling pain. (R. at 23-25.) Yet the ALJ found Plaintiff's testimony regarding her limitations not credible. (R. at 23.) "Because the ALJ is in the best position to observe witnesses, we will not disturb her credibility determinations as long as they find some support in the record." *Dixon*, 270 F.3d at 1178-79. The ALJ noted that Plaintiff was not treated extensively for her condition, recent x-rays of her left arm and leg were normal, and although Plaintiff had a left grip strength one-tenth of normal, this was a subjective measurement based on how much force Plaintiff was willing to exert. (R. at 23.) The ALJ also observed Plaintiff's ability at the hearing to sort through documents and adjust her hair above shoulder level. (Id.) Plaintiff testified to performing household chores, visiting friends, and going grocery shopping. (R. at 676-81.) Therefore, based on all of the evidence in the record and on the reasons articulated by the ALJ, the ALJ could reasonably determine Plaintiff was not completely credible in her allegations of a disability impairment.

- 16 -

The ALJ properly determined Plaintiff's RFC because he built a logical bridge between the evidence in the record and his conclusion that Plaintiff can perform light work with certain limitations. The ALJ's assessment of Plaintiff's RFC is supported by substantial evidence, therefore this Court will affirm the ALJ's finding. *See Herron*, 19 F.3d at 333.

### B.     The Hypothetical Question to the VE

Plaintiff argues that the ALJ failed to incorporate all of her limitations in the hypothetical question presented to the VE because the ALJ did not discuss Plaintiff's testimony regarding her limited ability to stand and walk. Plaintiff asserts that this constituted a failure by the ALJ to meet his burden at step five. "If a claimant reaches step [five], the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy." *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). Plaintiff claims that the ALJ should have reconciled her asserted ability to stand or walk for two or three hours a day with the VE's testimony that if a hypothetical person could only stand or walk for two or three hours a day, this person would be unable to perform jobs in the light category. (R. at 688.) Additionally, Plaintiff argues that the ALJ's failure to include pushing and pulling limitations in the hypothetical constituted reversible error. (Pl.'s Resp. at 5-6.)

The Seventh Circuit has repeatedly held that "when considering the appropriateness of an hypothetical question posed to a vocational expert, '[a]ll that is required is that the hypothetical question be supported by the medical evidence in the record.'" *Cass*, 8 F.3d at 555-56 (quoting *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992)). The ALJ must consider and weigh all of the evidence in the record, however, he does not have to accept

Plaintiff's testimony of disability. *See Cichon v. Barnhart,* 222 F. Supp. 2d. 1019, 1029 (N.D. Ill. 2002); *Cass,* 8 F.3d at 555. "[E]ven objective medical evidence of a claimant's pain, which the ALJ must consider, does not mandate a finding of disability." *Ehrhart,* 969 F.2d at 539. The ALJ has the authority to resolve conflicting arguments based on the record. *Donahue v. Barnhart,* 279 F.3d 441, 444 (7th Cir. 2002). In fact, it is the ALJ's responsibility to resolve all factual issues and evidentiary conflicts. *Carradine,* 360 F.3d at 758.

In the present case the ALJ properly incorporated all of Plaintiff's limitations in the hypothetical presented to the VE. Although she argues that she is more limited than the ALJ found, Plaintiff's testimony regarding her limited ability to stand and walk is contradicted by objective medical evidence in the record. (E.g., R. at 102.) The December 1, 1998 assessment of Plaintiff's RFC indicated she could stand and walk for six hours out of an eight hour workday. (Id.) This medical opinion was affirmed by Dr. Patey on December 9, 1998 and by Dr. Graham on April 1, 1999. (R. at 108.) Furthermore, at her hearing, Plaintiff testified to being able to "walk a lot." (R. at 670.) Upon closer questioning by the ALJ, Plaintiff stated she could walk for a mile at a time, or longer, if it were not cold out. (Id.) She also testified to being able to drive herself around, to go grocery shopping, and to perform housework. (R. at 676-77, 683.) The ALJ does not have to accept Plaintiff's perception that a disability exists. *See Cass,* 8 F.3d at 555. The medical evidence along with Plaintiff's own description of her daily activities support the ALJ's ultimate determination that she was able to stand and walk for six hours out of an eight hour workday as required under light work. A reasonable mind could accept this evidence as adequate to support the ALJ's conclusion and therefore this Court will affirm the ALJ's finding on this point. *See Herron,* 19 F.3d at 333.

Additionally, Plaintiff argues that the ALJ failed to include a pushing and pulling limitation of the left arm in the hypothetical presented to the VE and therefore the VE's testimony cannot constitute substantial evidence supporting a denial of benefits. (Pl.'s Resp. at 5.) However, the record indicates that the hypothetical included "very limited use of the left upper extremity" and a left hand grip one-tenth of normal. (R. at 655-56.) This restriction properly took into account Plaintiff's limited use of her left arm and restricted ability to push and pull using her left arm.

The ALJ properly presented a hypothetical question that contained all of the limitations he found existed based on the medical and non-medical evidence, and Plaintiff's testimony. The VE indicated that a person with the limitations the ALJ provided would be able to perform jobs in the light category. (R. at 655-57.) "Having employed a hypothetical that was supported by substantial evidence in the record as a whole, the ALJ was *entitled to rely upon the opinion of the vocational expert* that there are a significant number of jobs in the economy that [claimant] could perform." *Harris v. Barnhart*, 356 F.3d 926, 931 (8th Cir. 2004) (emphasis added.) In the present case, because this Court finds that the hypothetical question properly contained all of Plaintiff's limitations and because the ALJ may thus rely on the VE's testimony, 20 C.F.R. § 404.1566(b), (e), the ALJ met its burden at step five to determine that there are jobs in the national economy that Plaintiff can perform. *See* 20 C.F.R. § 416.920; *Herron*, 19 F.3d at 333 n.8.

## C.    Vocational Expert's Testimony

Plaintiff's next area of argument again involves the vocational expert. Plaintiff asserts

that the jobs listed by the VE failed to take into account her limitations because some of their

description in the *Dictionary of Occupational Titles* ("DOT") conflict with Plaintiff's asserted

limitations. In response to the hypothetical given by the ALJ, the VE identified several available

job categories such as: assembler, security guard, and cleaner. (R. at 656, 686-87.) Plaintiff

claims that some of the occupations that fall under a category listed by the VE are inapplicable

because their description in the DOT include functions she is unable to perform. For example,

the DOT's description for "Cleaner, Housekeeping" includes moving furniture. *Dictionary of*

*Occupational Titles* 323.687-014 (2003). Plaintiff asserts that her limited strength in her left

hand precludes her from this position. She also claims that the position of "Food Assembler,

Kitchen" listed as an assembler position in the DOT is inapplicable because the ALJ restricted

her to limited interaction with the public. Plaintiff argues that because the VE failed to list

occupations that take into account her limitations, the ALJ cannot rely on the VE's testimony and

for this reason, this issue must be remanded.

The ALJ has the burden of determining whether Plaintiff's RFC enables her to perform

jobs in the national economy. *See Zurawski*, 245 F.3d at 886. The decision to employ the

services of a vocational expert is entirely the within the discretion of the ALJ. *Ehrhart*, 969 F.2d

at 540. A vocational expert is not required at a disability benefits hearing. *Id.* What is required

is reliable evidence "that would persuade a reasonable person that the limitations in question do

not significantly diminish the employment opportunities otherwise available." *Id.* In the present

case, the ALJ relied on a vocational expert in determining whether there are jobs in the national

economy Plaintiff can perform. A vocational expert is called to testify because of his familiarity with the specific requirements of various occupations, including working conditions and the attributes and skills needed. *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995). Vocational experts are allowed to express their opinion regarding available jobs, provided that the underlying data and reasoning are available upon request. *Donahue*, 279 F.3d at 446. Their function at a Social Security hearing is to determine which jobs the claimant can do and how many such jobs exist in the claimant's state of residence. 20 C.F.R. §§ 404.1566(b), (e); *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004); *Donahue*, 279 F.3d at 446; *Osenbrock v. Apfel*, 240 F.3d 1157, 1162-63 (9th Cir. 2001); *Vaughan*, 58 F.3d at 132 (5th Cir. 1995).

Plaintiff argues that the ALJ erred in relying on the vocational expert because some of the job descriptions listed in the DOT fail to match up with Plaintiff's RFC. For example, Plaintiff claims she cannot perform one of the cleaner positions because its definitions in the DOT includes moving furniture. Without reaching the issue of whether these jobs are truly incompatible with her limitations, we turn to Seventh Circuit authority: "[w]hen no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion, even if that conclusion differs from the [DOT]" because the DOT "just records other unexplained conclusions and is not even subject to cross-examination." *Donahue*, 279 F.3d at 446; *see Jens*, 347 F.3d at 213 (an ALJ is permitted to rely on the vocational expert's testimony, even if it contradicts the DOT). In this case, after the vocational expert testified as to the number of jobs available to Plaintiff given her limitations, Plaintiff's counsel could have asked the expert questions regarding the source of the numbers and whether the expert's conclusions exactly matched the DOT. Plaintiff's counsel failed to raise any questions regarding

any alleged discrepancies between the DOT and the occupations listed by the vocational expert. Therefore, the ALJ properly relied on the testimony of the VE to determine whether jobs exist in the national economy that Plaintiff can perform. Even though parts of some of the definitions of some of the jobs in the DOT may appear to not take into account all of Plaintiff's limitations, "the ALJ must be entitled to accept testimony of a vocational expert whose experience and knowledge in a given situation exceeds that of the [DOT's] authors." *Donahue*, 279 F.3d at 446.

Plaintiff also points out as persuasive authority Social Security Ruling 00-04p, acknowledging it became effective after the hearing which was held in November of 1999. SSR 00-04p states that the ALJ has a duty to ask the vocational expert whether there is any conflict between the vocational expert's testimony regarding the requirements of a job or occupation and the DOT. Yet, as Plaintiff's counsel is aware, it appears that SSR 00-04p does not place the sole duty on the ALJ to question the vocational expert regarding any inconsistencies with the DOT and to resolve any conflicts before relying on the vocational expert's testimony. *See Buchholtz v. Barnhart*, 98 Fed. Appx. 540, 546 (7th Cir. 2004) (unpublished) (placing burden on claimant's counsel to indicate conflict between vocational expert's testimony and the DOT even though SSR 00-04p was effective before the ALJ rendered his decision); *Donahue*, 279 F.3d at 446-47. Thus, in this case, because SSR 00-4p was not in effect and thus not binding on the ALJ, and because the ALJ has the discretion to accept the VE's testimony regarding the jobs available for a person with Plaintiff's limitations if the hypothetical question adequately listed her impairments, as it does here, and because Plaintiff's attorney did not raise any alleged discrepancy between the VE's testimony and the DOT at the hearing, the ALJ correctly relied on the VE's testimony.

## D.     Mental RFC

Lastly, Plaintiff claims that the ALJ knew she had a mental impairment and therefore should have assessed her mental RFC.  In the hypothetical presented to the VE the ALJ limited the hypothetical person's interaction with others due to pain and based on that, Plaintiff asserts "there is a clear indication that the ALJ found an undiagnosed, underlying mental impairment." (Pl.'s Mem. at 20.)  Plaintiff further alleges that "[b]y stating Plaintiff['s] complaints of pain would preclude her from interacting with others, in effect the ALJ is finding that the Plaintiff suffers from a Somatoform disorder." (Id. at 21-22.)

It is well established that Plaintiff has the burden of providing the evidence the ALJ will use in determining Plaintiff's residual functional capacity.  *See* 20 C.F.R § 404.1545(a)(3); 20 C.F.R. § 416.945(c).  Plaintiff also bears the responsibility of providing medical evidence of a mental impairment.  *See* 20 C.F.R. §§ 404.1514 and 404.1508; *Howell v. Sullivan*, 950 F.2d 343, 348 (7th Cir. 1991).  The ALJ, however, bears the burden of ensuring Plaintiff's medical history is fully and fairly developed, which may entail arranging for consultative examinations if necessary, and aiding Plaintiff in obtaining medical reports from Plaintiff's medical sources.  *See* 20 C.F.R. § 404.1545(a)(3); 20 C.F.R. § 416.945(c); *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991) (ALJ failed to fully and fairly develop the record of a claimant who was unrepresented by counsel when he overlooked diagnosis of adjustment disorder with depressed mood).  However, the Seventh Circuit has also held that the ALJ may not substitute his opinion for that of a doctor without relying on other medical evidence in the record.  *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

Plaintiff contends that the ALJ should have performed a mental RFC assessment. However, before the ALJ is required to determine Plaintiff's mental RFC, the ALJ must first find that Plaintiff suffers from a severe mental impairment. *See* 20 C.F.R. § 416.920(a)(4)(ii). The ALJ did not find that Plaintiff suffers from a severe mental impairment. Additionally, the ALJ has the discretion to decide whether a mental examination is necessary and whether he believes there is enough information in the record to assess the existence of a disability. *See Griffith v. Callahan*, 138 F.3d 1150, 1153 (7th Cir. 1998), *overruled other grounds, Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999). In this case, the Plaintiff does not present any evidence of a severe mental impairment, the record indicates that Plaintiff has not been diagnosed with a mental disorder, and the ALJ did not find that Plaintiff's behavior at the hearing or in the record was serious enough to warrant ordering a mental examination.

Plaintiff alleges the ALJ knew she had a mental impairment because he restricted Plaintiff's interaction with others due to pain, yet failed to assess her mental RFC. However, the ALJ explicitly states that this restriction is due to Plaintiff's chronic pain complaints. (R. at 655.) This Court does not accept Plaintiff's speculation regarding what the ALJ thought at the time of the hearing because there simply is no evidence supporting Plaintiff's allegations. Furthermore, although Plaintiff goes so far as to claim the ALJ's restriction is evidence of the ALJ finding that Plaintiff suffers from a Somatoform disorder, there is not one single diagnosis in the medical record that Plaintiff suffers from a Somatoform disorder.

It is important to note that neither the ALJ nor Plaintiff's counsel are medical experts and therefore both should refrain from "playing doctor." *See Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990); *Wilkins v. Sullivan*, 889 F.2d 135, 140 (7th Cir. 1989). "[A]n ALJ must not

substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Clifford*, 227 F.3d at 870. In this case, there is no medical evidence to support a finding that (1) Plaintiff had a mental impairment that was severe enough to require a mental RFC determination or that (2) the ALJ found Plaintiff had a mental impairment.

To support her allegations, Plaintiff points to evidence in the record showing she was told to see a psychologist. Evidence in the record regarding this point is scarce and does not indicate the existence of a mental impairment. In a March 30, 2000 letter to two other physicians, presumably to consult with them regarding Plaintiff's condition, Dr. Ghaly stated he would like Plaintiff to see a psychologist. (R. at 222.) However, this statement is the last sentence of a three page letter that detailed Plaintiff's physical complaints. (Id.) This letter does not provide any reason for suggesting Plaintiff see a psychologist, nor does it explicate any indication of a mental impairment. (Id.) Also, this evidence was not before the ALJ when he conducted the November 17, 1999 hearing, nor when he rendered his March 22, 2000 decision.

On July 14, 2000, a physician's note stated that Plaintiff was referred to Dr. Brown, a psychologist, "for *chronic pain syndrome, biofeedback, etc.*" (R. at 348) (emphasis added.) The physician's note states the reason for referring Plaintiff to a psychologist is to address her complaints of pain. (Id.) This note does not indicate concerns of any mental impairment. Likewise, as indicated in the physician's note dated September 1, 2000, Plaintiff was told she should try to go and see Dr. Brown at the pain clinic. (R. at 350.) Again, there is no indication in the note that the physician was unduly concerned about a mental impairment. (Id.) This information was also not before the ALJ prior to the rendering of his decision. Plaintiff went to see Dr. Brown on October 9, 2000. (R. at 257.) She learned that Dr. Brown is a clinical

psychologist and inquired as to whether the doctor was able to give her medical disability. (Id.) "When she was informed that this examiner was not able to provide her with medical disability, she stated that that was her primary reason for attending the appointment and therefore did not wish to continue with this appointment." (Id.) The physician's notes dated October 9, 2000 indicated that Plaintiff intended to seek a referral to a physician within the Pain Clinic in order to pursue disability for her pain condition. (Id.)

Additionally, Plaintiff alleges that a medical examination form dated May 20, 2002, stated Plaintiff "needs psychological support." (R. at 624.) Again, this information was not before the ALJ during the November 1999 hearing nor was it before the ALJ when he rendered his March 2000 decision. Regardless, this statement on its own does not conclusively establish the existence of a medical condition. Plaintiff did not go to a psychologist and she did not receive a mental evaluation. In fact, she stated she would not go if the ALJ asked her to do so, even though the ALJ told her that one of the characteristics of unremitting pain may have psychological consequences. (R. at 698.) The evidence in the record indicate that the one time she did go see Dr. Brown, a psychologist, she left upon discovering Dr. Brown was a psychologist and could not help her receive medical disability. (R. at 257; 698.) Plaintiff bears the responsibility of providing medical evidence of a mental impairment. *See* 20 C.F.R. §§ 404.1514 and 404.1508; *Howell*, 950 F.2d at 348.

Plaintiff also claims that her behavior, documented by the record, supports a finding of a severe mental impairment. On November 14, 2000 Plaintiff brought in a jar of spiders to be tested for brown recluse spiders. (R. at 562.) Plaintiff believed that she was being bitten by brown recluse spiders and she sought treatment for the bites on her legs. (R. at 221, 347-48.)

- 26 -

The physician's note dated November 14, 2000 indicated that the doctor believed Plaintiff's alleged spider bites were actually the result of a picking disease. (R. at 562.) Nevertheless, this evidence does not conclusively indicate the existence of a severe mental disorder, nor did the physician diagnose a mental disorder.

Lastly, Plaintiff contends that her mental impairment was displayed most prominently during the hearing. Plaintiff points to fact that she continuously interrupted the ALJ, the VE, and her lawyer during the hearing, despite being told she would be given a chance to speak at the end, and when she was responding to questions her answers were rambling and off topic. (R. at 686-94, 697.) The fact remains, however, that the ALJ was in the best position to observe Plaintiff's behavior at the hearing and determine whether the behavior was severe enough to warrant additional medical examination or whether there was enough information in the record to assess the existence of a disability. *See Griffith*, 138 F.3d at 1153; *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994).

In this case, Plaintiff has never been diagnosed with any mental illness and the ALJ did not find a mental impairment despite the behavior he observed at the hearing. This Court finds that because there was no medical evidence indicating a severe mental impairment and because the ALJ is in the best position to determine whether Plaintiff's behavior at the hearing was severe enough to warrant a mental examination, the ALJ's determination will be affirmed.

## V. **Conclusion**

For the reasons stated above, the Court affirms the Commissioner's final decision. The Commissioner's motion for summary judgment is therefore granted and Plaintiff's motion for summary judgment is denied.


**MARTIN C. ASHMAN**
Dated: September 7, 2004.                    United States Magistrate Judge

Copies have been mailed to:

FREDERICK J. DALEY, JR., Esq.
JAMES R. COMERFORD, Esq.
Daley, DeBofsky & Bryant
One North LaSalle Street
Suite 3800
Chicago, IL 60602

MS. ANNE LIPNITZ
Special Assistant U.S. Attorney
200 West Adams Street
30th Floor
Chicago, IL 60606

Attorneys for Plaintiff

Attorney for Defendant